Michael A. Columbo (SBN: 271283)
mcolumbo@dhillonlaw.com
Jesse Franklin-Murdock (SBN: 339034)
jfm@dhillonlaw.com
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, CA 94108
(415) 433-1700

Christopher G. Renner*
D.C. Bar No. 1025699
cgrenner@dhillonlaw.com
Domenic P. Aulisi*
Virginia Bar No. 101045
daulisi@dhillonlaw.com
DHILLON LAW GROUP INC.
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314
(415) 433-1700

    *    *pro hac vice* forthcoming

***Attorneys for Plaintiffs***

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Amaral Dairy Farms; Cross A Dairy LP; Dairy Central; GJC Dairy, Inc.; Gordon Hay Inc.; Brindeiro & Danbom Dairy Farm; Johal Dairy; South Corner Dairy; Hoppy Cow Dairy; Joe O. Rocha Dairy Inc.; Roest Family Dairy; Arthur F. and Tina Marie Silva Dairy; Miranda Dairy; and Bryan and Sons, LLC;** | Case No. _____ |
| Plaintiffs, | COMPLAINT |
| v. | JURY TRIAL DEMANDED |
| **Charles Ahlem; Anthony Nunes III; Jarrid Bordessa; Arie H De Jong; Joseph Fernandes; Art Van Beek; William Dyt; Arlin Van Groningen; Kerri Vander Poel; Fred Fagundes; Case Van Steyn; Alex De Jager; Dominic Assali; and Darlene Lopes,** | |
| Defendants. | |



Complaint

**COMPLAINT**

Plaintiffs Amaral Dairy Farms; Cross A Dairy LP; Dairy Central; GJC Dairy, Inc.; Gordon Hay Inc.; Brindeiro & Danbom Dairy Farm; Johal Dairy; South Corner Dairy; Hoppy Cow Dairy; Joe O. Rocha Dairy Inc.; Roest Family Dairy; Arthur F. and Tina Marie Silva Dairy; Miranda Dairy; and Bryan and Sons, LLC, (together, the "Plaintiffs") by and through their undersigned counsel, bring this action for trebled compensatory damages and for injunctive relief under the antitrust laws of the United States against Defendants Charles Ahlem, Anthony Nunes III, Jarrid Bordessa, Arie H De Jong, Joseph Fernandes, Art Van Beek, William Dyt, Arlin Van Groningen, Kerri Vander Poel, Fred Fagundes, Case Van Steyn, Alex De Jager, Dominic Assali, and Darlene Lopes (together, the "Defendants") in their individual capacities and demanding a trial by jury. For their Complaint against Defendants, Plaintiffs allege the following:

**Introduction**

1.      This is an antitrust case challenging an anticompetitive cartel agreement among competing dairy farmers in California. The cartel agreement operates under the auspices of the Quota Implementation Program/Quota Administration Program ("QIP"). The QIP is a program by which some California dairy producers—those who have "quota certificates"—are paid a fixed premium for the raw Grade A milk they sell that is higher than the price paid to other producers who do not have quota certificates. The premium for quota-holders is funded by deductions from the proceeds of sales of all raw Grade A milk produced and sold in California, meaning that dairy farmers with no or low holdings of quota are forced to make subsidy payments to their competitors who hold more quota. All California Grade A dairy farmers are required to participate in the QIP regardless of whether they own quota.

2.      Although the ministerial and administrative tasks of this cartel agreement are handled by the California Department of Food and Agriculture (the "CDFA"), under the direction of the Secretary of the CDFA (the "Secretary"), neither the CDFA nor any other federal or state agency actively supervises the operation of the cartel, which is thus private, discretionary marketplace conduct subject to the antitrust laws. Instead, competing dairy farmers set the terms of the QIP and vote periodically to

Complaint

continue its terms. The CDFA is without authority to set the terms of the QIP or to unilaterally modify, amend, or terminate the QIP or any of its material terms.

3.     The majority of raw Grade A milk produced in California is sold pursuant to a Federal Milk Marketing Order ("FMMO") that regulates the price dairy farmers receive for their milk. Pursuant to the FMMO, all California dairy farmers have the opportunity to receive the same floor or minimum price for their raw Grade A milk sold to processing plants participating in the FMMO. The FMMO is actively supervised by the United States Department of Agriculture, and this action does not challenge the FMMO or its terms. The QIP operates on top of the FMMO and is not actively supervised by the CDFA, the USDA, or any other state or federal agency. Pursuant to the QIP, the CDFA levies an assessment on purchasers of raw Grade A milk, who then deduct from their payments to dairy farmers under the FMMO the monies collected by the CDFA. The CDFA then pays the assessment collected from purchasers to the dairy farmers who are holders of "quota," a tradeable entitlement created by the QIP. In this way, the FMMO price received by all California dairy farmers is lower than it would otherwise be, with the deducted sums being paid to quota holders by the CDFA at the expense of non-quota holders, whose "milk checks" are reduced by a corresponding amount.

4.     The QIP also applies in a similar way to raw Grade A milk produced and sold in California outside the operation of the FMMO. The CDFA levies an assessment on purchasers of raw Grade A milk, who, after remitting that payment, then deduct the same amount from their payments to dairy farmers. As is true under the FMMO, non-quota holders receive lower prices for their raw Grade A milk in an amount equal to the quota payment received by quota holders.

5.     The QIP functions as a "tax" levied by California dairy farmers holding quota on California dairy farmers that hold no or less quota. The tax is substantial—more than $90 million annually—and imposes a significant hardship on non-quota-holding dairy farmers. The tax imposed by the quota has anticompetitive effects in the market for Grade A raw milk produced and marketed in California, as non-quota holders are forced either to raise their prices for raw milk in an attempt to recoup the costs imposed on them by quota holders or to cede market share (or go out of business entirely) in competition with quota-holding dairy farmers. Quota holders are given the power to increase their prices

Complaint

in proportion to the degree to which non-quota holders' costs are increased. The QIP thus harms both non-quota holders, by raising their costs and impairing their ability to compete with quota holders, and the direct purchasers of raw Grade A fluid milk. Although the QIP operates to directly reduce the prices received by non-quota-holding dairy farmers, it has the effect of *increasing* the prices paid by purchasers and increasing the revenues and profits of quota holders. This is textbook economic theory: "The impact of a tax on a market outcome is the same whether the tax is levied on buyers or sellers of a good. When a tax is levied on buyers, the demand curve shifts downward by the size of the tax; when it is levied on sellers, the supply curve shifts upward by that amount. In either case, when the tax is enacted, the price paid by buyers rises, and the price received by sellers falls. In the end, the elasticities of supply and demand determine how the tax burden is distributed between producers and consumers." *See* N. Gregory Mankiw, Principles of Microeconomics 156 (7th ed. 2014).

6.    Although milk quota was created under color of California law, the State of California does not actively supervise the QIP. The State has no direct control over the terms or operation of the QIP. The terms of the QIP were established by quota holders according to their own economic interests, without regard to any actual or potential anticompetitive effects. California's role is restricted to enforcing the terms of the QIP as specified by the quota-holding dairy farmers. There is no control or pointed re-examination by the state to ensure that the policies of the Sherman Act are not unnecessarily subordinated to the economic interests of quota-holding dairy farmers. The State simply authorizes price setting and enforces the prices established by private parties.

7.    All of this raises the central question at issue in this lawsuit: If not the State of California, who then controls the QIP and is responsible for its anticompetitive effects? The Defendants, all of whom are competing California dairy farmers who hold quota and who, through their control of a CDFA advisory committee called the Producer Review Board ("PRB"), have collectively imposed unreasonable restraints on the ability of dairy farmers holding no or little quota to obtain relief from the effects of the QIP. Because no state or federal agency actively supervises the Defendants, they must conform their activities to the requirements of the antitrust laws. In this action, Plaintiffs call the Defendants to account for their conduct.

Complaint

**Parties**

*Plaintiffs*

8.       Plaintiff Amaral Dairy Farms is a sole proprietorship organized and existing under the laws of California with its principal place of business at 7706 Tegner Road, Hilmar, California 95324. Until July 2023, Amaral Dairy Farms produced and sold raw Grade A milk in California, paid monthly assessments levied pursuant to the QIP, and was injured by the conduct alleged herein.

9.       Plaintiff Cross A Dairy LP ("Cross A Dairy") is a limited partnership organized and existing under the laws of California with its principal place of business at 4125 Bentley Road, Oakdale, California 95361. Cross A Dairy produces and sells raw Grade A milk in California, pays monthly assessments levied pursuant to the QIP, and has been injured by the conduct alleged herein.

10.       Plaintiff Dairy Central is a sole proprietorship organized and existing under the laws of California with its principal place of business at 24051 Swenson Road, Hilmar, California 95324. Dairy Central produces and sells raw Grade A milk in California, pays monthly assessments levied pursuant to the QIP, and has been injured by the conduct alleged herein.

11.       Plaintiff GJC Dairy, Inc. ("GJC Dairy") is a corporation organized and existing under the laws of California with its principal place of business at 2401 Newman Road, Turlock, California 95380. GJC Dairy produces and sells raw Grade A milk in California, pays monthly assessments levied pursuant to the QIP, and has been injured by the conduct alleged herein.

12.       Plaintiff Gordon Hay Inc. ("Gordon Hay") is a corporation organized and existing under the laws of California with its principal place of business at 14451 Bon View Avenue, Ontario, California 91761. Gordon Hay produces and sells raw Grade A milk in California, pays monthly assessments levied pursuant to the QIP, and has been injured by the conduct alleged herein.

13.       Plaintiff Brindeiro & Danbom Dairy Farm is a general partnership organized and existing under the laws of California with its principal place of business at 5831 S. Tegner Road, Turlock, California 95380. Until November 2025, Brindeiro & Danbom Dairy Farm produced and sold raw Grade A milk in California, paid monthly assessments levied pursuant to the QIP, and was injured by the conduct alleged herein.



Complaint

14.     Plaintiff Johal Dairy is a partnership organized and existing under the laws of California with its principal place of business at 6354 W. Zeering Road, Turlock, California 95380. Johal Dairy produces and sells raw Grade A milk in California, pays monthly assessments levied pursuant to the QIP, and has been injured by the conduct alleged herein.

15.     Plaintiff South Corner Dairy is a sole proprietorship organized and existing under the laws of California with its principal place of business at 8150 Avenue 360, Visalia, California 93291. South Corner Dairy produces and sells raw Grade A milk in California, pays monthly assessments levied pursuant to the QIP, and has been injured by the conduct alleged herein.

16.     Plaintiff Hoppy Cow Dairy is a general partnership organized and existing under the laws of California with its principal place of business at 8431 Ave 360, Dinuba, California 93618. Hoppy Cow Dairy produces and sells raw Grade A milk in California, pays monthly assessments levied pursuant to the QIP, and has been injured by the conduct alleged herein.

17.     Plaintiff Joe O. Rocha Dairy Inc. ("Joe O. Rocha Dairy") is a corporation organized and existing under the laws of California with its principal place of business at 18451 West Bradbury Road, Turlock, California 95380. Joe O. Rocha Dairy produces and sells raw Grade A milk in California, pays monthly assessments levied pursuant to the QIP, and has been injured by the conduct alleged herein.

18.     Plaintiff Roest Family Dairy is a partnership organized and existing under the laws of California with its principal place of business at 2472 Gates Road, Modesto, California 95358. Roest Family Dairy produces and sells raw Grade A milk in California, pays monthly assessments levied pursuant to the QIP, and has been injured by the conduct alleged herein.

19.     Plaintiff Arthur F. and Tina Marie Silva Dairy is a partnership organized and existing under the laws of California with its principal place of business at 12636 West Main Avenue, Crowslanding, California 95313. Until November 2024, Arthur F. and Tina Marie Silva Dairy produced and sold raw Grade A milk in California, paid monthly assessments levied pursuant to the QIP, and was injured by the conduct alleged herein.

20.     Plaintiff Miranda Dairy is a general partnership organized and existing under the laws of California with its principal place of business at 965 Waddington Road, Ferndale, California 95536.

Complaint

Miranda Dairy produces and sells raw Grade A milk in California, pays monthly assessments levied pursuant to the QIP, and has been injured by the conduct alleged herein.

21. Plaintiff Bryan and Sons, LLC is a limited liability company organized and existing under the laws of California with its principal place of business at 5510 Amethyst Ave., Alta Loma, California 91737. Until September 2023, Bryan and Sons, LLC produced and sold raw Grade A milk in California, paid monthly assessments levied pursuant to the QIP, and was injured by the conduct alleged herein.

### *Defendants*

22. Defendant Charles Ahlem is the owner of Charles Ahlem Ranch, and in that capacity causes raw Grade A milk to be produced and sold in California. Since at least May 1, 2017, Defendant Charles Ahlem has served as a member of the PRB. Charles Ahlem Ranch is, upon information and belief, a sole proprietorship organized and existing under the laws of California, with its principal place of business at 23546 American Ave, Hilmar, California 95324. Defendant Charles Ahlem holds or is a beneficiary of milk quota, competes with one or more other Defendants and one or more Plaintiffs in the sale of milk, and has an economic incentive to restrain trade in the manner alleged herein.

23. Defendant Anthony Nunes III is an owner of Nunes Brothers Dairy, and in that capacity causes raw Grade A Milk to be produced and sold in California. Since at least May 1, 2017, Defendant Anthony Nunes III has served as a member of the PRB, first as an alternate member before becoming a full member on January 1, 2019. Nunes Brothers Dairy is organized and exists under the laws of California, with its principal place of business at 20445 Road 124, Tulare, California 93274. Defendant Anthony Nunes III holds or is a beneficiary of milk quota, competes with one or more other Defendants and one or more Plaintiffs in the sale of milk, and has an economic incentive to restrain trade in the manner alleged herein.

24. Defendant Jarrid Bordessa is the owner of Bordessa Family Dairies GP, and in that capacity causes raw Grade A milk to be produced and sold in California. Since at least May 1, 2017, Defendant Jarrid Bordessa has served as a member of the PRB. Bordessa Family Dairies GP is a general partnership organized and existing under the laws of California, with its principal place of business at 14055 Valley Ford Estero Road, Valley Ford, California 94972. Defendant Jarrid Bordessa holds or is a

Complaint

beneficiary of milk quota, competes with one or more other Defendants and one or more Plaintiffs in the sale of milk, and has an economic incentive to restrain trade in the manner alleged herein.

25.     Defendant Arie H De Jong is the owner of Milky Way Dairy, LLC, and in that capacity causes raw Grade A milk to be produced and sold in California. Defendant Arie H De Jong served as a member of the PRB from May 1, 2017, through December 31, 2024. Milky Way Dairy, LLC is a limited liability company organized and existing under the laws of California, with its principal place of business at 16175 Paula Road, Madera, California 93636. Defendant Arie H De Jong holds or is a beneficiary of milk quota, competes with one or more other Defendants and one or more Plaintiffs in the sale of milk, and has an economic incentive to restrain trade in the manner alleged herein.

26.     Defendant Joseph Fernandes is affiliated with one or more family-owned California dairy farms and in that capacity causes raw Grade A milk to be produced and sold in California. Defendant Joseph Fernandes served as a member of the PRB from May 1, 2017, through December 31, 2024. Defendant Joseph Fernandes holds or is a beneficiary of milk quota, competes with one or more other Defendants and one or more Plaintiffs in the sale of milk, and has an economic incentive to restrain trade in the manner alleged herein.

27.     Defendant Art Van Beek is the owner of El Monte Dairy Limited Partnership, and in that capacity causes raw Grade A milk to be produced and sold in California. Defendant Art Van Beek served as a member of the PRB from January 1, 2018, through 2024, serving as PRB Chair between 2022 and 2024. El Monte Dairy Limited Partnership is a limited partnership organized and existing under the laws of California, with its principal place of business at 10410 Avenue 160, Tipton, California 93272. Defendant Art Van Beek holds or is a beneficiary of milk quota, competes with one or more other Defendants and one or more Plaintiffs in the sale of milk, and has an economic incentive to restrain trade in the manner alleged herein.

28.     Defendant William Dyt is the owner of Dyt Dairy, and in that capacity causes raw Grade A milk to be produced and sold in California. Since January 1, 2018, Defendant William Dyt has served as a member of the PRB, serving as PRB Vice Chair in 2022 and 2024. Dyt Dairy is, upon information and belief, a sole proprietorship organized and existing under the laws of California, with its principal

Complaint

place of business at 6205 Archibald Street, Corona, California 92880. Defendant William Dyt holds or is a beneficiary of milk quota, competes with one or more other Defendants and one or more Plaintiffs in the sale of milk, and has an economic incentive to restrain trade in the manner alleged herein.

29.    Defendant Arlin Van Groningen is the owner of New Hope Dairy, LLC, and in that capacity causes raw Grade A milk to be produced and sold in California. Defendant Arlin Van Groningen served as a member of the PRB from May 1, 2017, to December 31, 2020, as an alternate member, and then from January 1, 2021, to December 31, 2024, as a full member. New Hope Dairy LLC is a limited liability company organized and existing under the laws of California, with its principal place of business at 9547 New Hope Road, Galt, California 95632. Defendant Arlin Van Groningen holds or is a beneficiary of milk quota, competes with one or more other Defendants and one or more Plaintiffs in the sale of milk, and has an economic incentive to restrain trade in the manner alleged herein.

30.    Defendant Kerri Vander Poel is the owner of Skyview Dairy, and in that capacity causes raw Grade A milk to be produced and sold in California. Since at least January 1, 2019, Defendant Kerri Vander Poel has served as a member of the PRB. Skyview Dairy is a general partnership organized and existing under the laws of California, with its principal place of business at 28989 Riverside Street, Shafter, California 93263. Defendant Kerri Vander Poel holds or is a beneficiary of milk quota, competes with one or more other Defendants and one or more Plaintiffs in the sale of milk, and has an economic incentive to restrain trade in the manner alleged herein.

31.    Defendant Fred Fagundes is the owner of Fagundes Brothers, LLC, and in that capacity causes raw Grade A milk to be produced and sold in California. Since at least January 1, 2020, Defendant Fred Fagundes has served on the PRB. Fagundes Brothers, LLC is a limited liability company organized and existing under the laws of California, with its principal place of business at 1978 Business Park Way, Merced, California 95348. Defendant Fred Fagundes holds or is a beneficiary of milk quota, competes with one or more other Defendants and one or more Plaintiffs in the sale of milk, and has an economic incentive to restrain trade in the manner alleged herein.

32.    Defendant Case Van Steyn is the owner of Van Steyn Dairy, and in that capacity causes raw Grade A milk to be produced and sold in California. Defendant Case Van Steyn served as a member

Complaint

of the PRB from at least January 1, 2016, through December 31, 2023. Van Steyn Dairy is a general partnership organized and existing under the laws of California, with its principal place of business at 13039 Pellandini Road, Galt, California 95632. Defendant Case Van Steyn holds or is a beneficiary of milk quota, competes with one or more other Defendants and one or more Plaintiffs in the sale of milk, and has an economic incentive to restrain trade in the manner alleged herein.

33.    Defendant Alex De Jager is the general manager of Vista Verde Dairy, and in that capacity causes raw Grade A milk to be produced and sold in California. Defendant Alex De Jager has served as a member of the PRB since January 1, 2025. Vista Verde Dairy is a general partnership organized and existing under the laws of California, with its principal place of business at 8911 South Bliss Road, Chowchilla, California 93610. Defendant Alex De Jager holds or is a beneficiary of milk quota, competes with one or more other Defendants and one or more Plaintiffs in the sale of milk, and has an economic incentive to restrain trade in the manner alleged herein.

34.    Defendant Dominic Assali is the operator of Double D Dairy, LLC, and in that capacity causes raw Grade A milk to be produced and sold in California. Defendant Dominic Assali has served as a member of the PRB since January 1, 2025. Double D Dairy, LLC is a limited liability corporation organized and existing under the laws of California, with its principal place of business at 30312 Road 152, Visalia, California 93292. Defendant Dominic Assali holds or is a beneficiary of milk quota, competes with one or more other Defendants and one or more Plaintiffs in the sale of milk, and has an economic incentive to restrain trade in the manner alleged herein.

35.    Defendant Darlene Lopes is the owner of Tony L. Lopes Diary Corporation and Tony L. Lopes, L.P., doing business as P&D Dairies, and in that capacity causes raw Grade A milk to be produced and sold in California. Defendant Darlene Lopes has served as an alternate member of the PRB since January 1, 2025. Tony L. Lopes Dairy Corporation is a corporation organized and existing under the laws of California, with its principal place of business at 9270 South Whitworth, Gustine, California 95322. Tony L. Lopes L.P., doing business as P&D Dairies, is a limited partnership organized and existing under the laws of California, with its principal place of business at 9270 South Whitworth, Gustine, California 95322. Defendant Darlene Lopes holds or is a beneficiary of milk quota, competes with one or more other

9

Defendants and one or more Plaintiffs in the sale of milk, and has an economic incentive to restrain trade in the manner alleged herein.

36.     Each Defendant acted as the agent or co-conspirator of or for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein. All Defendants are jointly and severally liable for the acts of all members of the conspiracy.

### Jurisdiction and Venue

37.     This Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. §§ 1331 and 1337.

38.     Plaintiffs have standing to bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.

39.     This Court has general personal jurisdiction over Defendants Charles Ahlem, Anthony Nunes III, Jarrid Bordessa, Arie H De Jong, Joseph Fernandes, Art Van Beek, William Dyt, Arlin Van Groningen, Fred Fagundes, Case Van Steyn, Alex De Jager, Dominic Assali, and Darlene Lopes because, on information and belief, they all reside in California, which subjects each of those individual Defendants to the general personal jurisdiction of California courts, and by extension of this Court. This Court has specific personal jurisdiction under California Civil Code of Procedure Section 410.10 over each of the Defendants because each Defendant purposefully directed their activities as alleged herein toward California and in California and purposefully availed themselves of the privilege of conducting activities in California.

40.     Venue is proper in this District under 15 U.S.C. §§ 15 and 26 and under 28 U.S.C. § 1391.

41.     The proper intradistrict venue for this action is Fresno, as this action arose in one or more of the counties listed in Local Rule 120(d) for which commencement in Fresno is proper.

42.     The conduct of the Defendants alleged herein had and continues to have a substantial effect on interstate commerce. By increasing the price of raw grade A milk marketed in California, the Defendants' conduct has decreased shipments of California milk and dairy products in interstate commerce.

Complaint

**Factual Background**

43.    The QIP arose against the backdrop of a long and complex milk regulatory regime in California. Quota was originally an integral part of a broader regulatory scheme actively supervised by the State of California through the CDFA. Today, that broader state regulatory regime has vanished, the active supervision of the State of California has ceased, and QIP stands as an anachronistic remnant that no longer serves any public purpose but instead serves as a bare entitlement vested in powerful dairy farmers at the expense of a disfavored minority.

*The Market for Grade A Milk*

44.    The relevant product market at issue in this action is raw Grade A milk. Raw milk is milk taken directly from the cow. Grade A milk is milk produced and processed under sanitary regulations prescribed, inspected, and approved by public health authorities for fluid consumption. It is labeled as "Grade A" to denote higher quality and stricter sanitary conditions compared to other grades. In California, it is also called market milk. Suppliers of Grade A milk—dairy farmers—are licensed by the State of California in the form of a market milk permit issued pursuant to California law.

45.    The vast majority of the milk produced in California is Grade A milk. Lower grades of milk are not seen as a viable option for dairy farmers, who must maintain Grade A status to remain commercially viable.

46.    Dairy farmers milk their cows at least twice every day and must do so every day to maintain the health of their cows. The resulting raw milk is highly perishable and must be received by a processor and processed within 48–72 hours of milking. Raw milk is typically stored in refrigerated bulk tanks until it is picked up by a milk hauler, who transports it in insulated trucks to milk processing plants.

47.    Dairy farmers and their marketing cooperatives sell raw Grade A milk to raw milk processing plants that use raw milk to manufacture dairy products.

48.    Grade A raw milk production volume is inelastic to short- or medium-term changes in price. Because of their large, specialized capital expenditures, the long lead times necessary to adjust their dairy cow herd size, the difficulty of switching their productive assets (including dairy herd, milking



Complaint

parlors, cow barns, and calf hutches) to other forms of agricultural production, and the perishable nature of milk, dairy farmers cannot readily adjust their output to price changes.

49.     Grade A raw milk is a product with no close economic substitute. Alternative products marketed as "milk" derived from plant-based sources have different nutritional and physical characteristics that make them largely unsubstitutable for Grade A raw milk from the standpoint of handlers.

*California's Economic Regulation of Grade A Raw Milk*

50.     In 1935, the California Legislature passed the Milk Stabilization Act, which authorized the CDFA to establish minimum prices that dairy farmers would be paid by handlers for their milk. *See* Cal. Food & Agric. Code §§ 61801–62403. Class 1 dairy product (fluid milk) commanded the highest price. Handlers paid progressively lower prices for raw milk processed into non-fluid products.

51.     The Milk Stabilization Act had no mechanism for revenue sharing among California dairy farmers, who competed for sales to the highest-paying (Class 1) handlers.

52.     In the 1960s, California dairy farmers sought a mechanism to limit competition for sales to Class 1 handlers. The perceived problems created by unrestrained competition for sales to higher-paying handlers were understood by dairy farmers to require a legislative solution, requiring the compromise and give-and-take characteristic of the political process. According to the CDFA:

> Producers realized the necessity of developing a system that would bring relief to their problems and provide a more equitable allocation of the revenues generated from Class 1 milk sales. Producers and producer organizations concluded that such a system could be brought about only through legislation and introduced a number of milk pooling bills into the California Legislature. These early efforts to establish a revenue distribution program were not successful because the producer community could not agree on the basic concepts of the program.

53.     The United States Department of Agriculture ("USDA") has also described the *status quo ante* before the introduction of a revenue pooling mechanism among California dairy farmers:

> Until that point, dairy farms were paid through individual handler pools that reflected a plant's use values for their milk—there was no marketwide pooling function that allowed all producers to share in the benefits from Class 1 sales and the burden of balancing the market to ensure an adequate supply of milk to meet Class 1 demand. Many witnesses spoke to the political compromise reached to compensate dairy farmers who held Class 1

Complaint

supply contracts from the financial loss they would incur by pooling and sharing their Class 1 revenue with all dairy farmers in California.

54.     The solution to unrestrained competition for sales to higher-paying handlers was ultimately found by the California Legislature in the Gonsalves Milk Pooling Act, Division 21, Part 3, Chapter 3 of the California Food and Agriculture Code. *See* Cal. Food & Agric. Code §§ 62700–62731. This act required the California State Secretary of Agriculture to formulate a pooling plan for revenue sharing among California dairy farmers and submit it in a referendum to all eligible market milk producers for their approval or disapproval. The producers voted by referendum to approve the milk pooling plan, and it was implemented in 1967.

55.     Under the milk pooling plan, instead of paying producers directly based on individually negotiated prices, handlers were required to pay minimum prices set by CDFA per class of dairy product into a "pool" fund. Producers were then paid from the pool on the basis of a poolwide blend price that reflected the poolwide utilization of all classes of dairy products.

56.     Under this pooling arrangement, producers who at the time had extensive Class 1 contracts would have suffered a loss in revenue when the pooling plan was implemented because the mandatory poolwide blend price was lower than the prices they individually negotiated with handlers for Class 1 contracts. To induce producers with substantial Class 1 sales to support the pooling plan, a "quota" was included in the Gonsalves Milk Pooling Act, allocated based on each producer's past Class 1 sales as a way of compensating those producers for the revenue they would have otherwise lost pursuant to the pooling plan.

57.     Quota is essentially a certificate entitling its holder to receive extra revenue for the sale of milk. Under the pooling plans promulgated under the Gonsalves Milk Pooling Act, producers selling milk would receive payments for the sale of their milk according to a common revenue calculation, but an additional payment was made only to quota holders, depending on the amount of quota certificates they owned. This additional payment to quota holders was deducted from the pooled revenue before the calculation of the poolwide blend price. In this way, non-quota holders would subsidize the value of quota through lower receipts from the sale of their milk.

Complaint

58.    Producers were permitted to sell quota to other producers and have done so many times, such that ownership of quota today is no longer tied to past or present Class 1 production and therefore no longer serves the purpose of incentivizing support for pooling from those who would otherwise lose revenues by not being able to negotiate their own price.

59.    Sections 62700–62702 contained the California Legislature's findings and declaration of purpose with respect to the Gonsalves Milk Pooling Act. Section 62702 recited a legislative purpose to "equalize gradually the distribution of class 1 usage among the producers of this state." In an amendment to the statute ten years later, the Legislature reaffirmed this goal and redoubled its commitment with those amendments to, *inter alia*, "provide a reasonable and equitable mechanism to permit more accelerated equalization." *Id.* at § 62702.1.

60.    Despite this clear expression of legislative intent and purpose, such equalization of quota never happened. The CDFA has allocated no new quota since 1991.

***Promulgation of the QIP***

61.    In 2015, almost 50 years after the Gonsalves Act, the three largest dairy producer cooperatives in California petitioned the USDA to implement an FMMO in California, which would transfer economic regulation of raw milk sales in California from state to federal jurisdiction.

62.    Following a hearing, the USDA issued a decision recommending provisions for a California FMMO that would supersede the pooling plan administered under the Gonsalves Milk Pooling Act. The recommended California FMMO did not include provisions for federal administration of the quota program. Instead, the USDA's recommended Order contemplated only those quota deductions as separately authorized by the CDFA. As the CDFA explained:

> In February of 2017, United States Department of Agriculture (USDA) published its recommended decision for the establishment of a California Milk Marketing order (CA FMMO). The recommended decision does not allow for quota to be incorporated in the pricing and pooling provisions of a CA FMMO. Rather, it would necessitate quota to operate independently of a CA FFMO as a stand-alone program, administered by the California Department of Food and Agriculture (Department).

63.    In a letter dated May 12, 2017, the Secretary notified the USDA that in response to the USDA's decision recommending a California FMMO, the CDFA was "ready and willing to establish a

14

Complaint

stand-alone, producer funded quota program." The Secretary also stated that the CDFA intended to sponsor California legislation to ensure that the CDFA had the authority to establish and administer a stand-alone quota program, convene the Provider Review Board ("PRB") to draft the substance of a stand-alone quota program, and hold a producer referendum on the PRB's recommended program.

64.     The PRB was established under Section 62719 of the Gonsalves Milk Pooling Act to represent the interests of California dairy farmers. *See* Cal. Food & Agric. Code § 62719. The PRB is comprised of no fewer than 12 members, all of whom are California dairy farmers nominated by other California dairy farmers. *Id.* The PRB members may nominate candidates for one additional member of the PRB to serve as a public member of the PRB. The CDFA has no ability to appoint a PRB member who is not first nominated by California dairy farmers. At all times from 2017 through the present, the PRB has been dominated by market participants (California dairy farmers) who hold quota and benefit economically from high quota prices and the continuation of the quota program. Non-quota holders, when represented on the PRB, have been a distinct minority of Board members. Although Section 62719 requires that PRB members "shall give proportionate representation to all areas of the state," it does not require proportionate representation of quota holders and non-quota holders. Since 2017, beneficiaries of the QIP have generally outnumbered holders of no or little quota on the PRB by a ratio of at least 5:1. The CDFA has declined to solicit the participation of additional non-quota holders on the PRB.

65.     In May 2017, the CDFA sponsored California legislation authorizing it to establish and administer the stand-alone quota program that would become the QIP. Approximately one month later, the legislation was signed into law and codified at California Food and Agricultural Code, Chapter 3.5, Section 62757.

66.     Section 62757 is the sole statutory authority under California law for the QIP. It was drafted and sponsored by an employee of the CDFA, Jim Houston. According to a declaration filed by Mr. Houston in another case challenging the QIP, Mr. Houston was "the drafter of Section 62757" and was "the lead CDFA official most intimately involved in the month-long QIP drafting process."

67.     According to Mr. Houston, the CDFA was concerned no later than early May 2017 that it lacked authority under California law to establish the QIP. According to Mr. Houston, it was precisely



Complaint

because the CDFA perceived its authority to establish the QIP under existing law to be questionable that the CDFA sponsored a bill (called the 2017 Trailer Bill) now codified at Section 62757.

68.    Section 62757 received little attention in the legislative process. According to Mr. Houston, the 2017 Trailer Bill was intentionally drafted "to be as noncontroversial and easy to get through the legislature as possible." Mr. Houston offered the following account of the Legislature's consideration of the 2017 Trailer Bill:

> Based on my experience, I believe that the 2017 Trailer Bill was universally viewed as a noncontroversial bill, and thus received little legislative scrutiny. The end-result is that the 2017 Trailer Bill was passed into law and codified at Section 62757 of the FAC exactly as I drafted it.

69.    Section 62757 provided that upon the establishment of a federal milk marketing order, the Secretary was empowered "to establish a stand-alone quota program, the details of which shall be included in the pooling plan." Cal. Food & Agric. Code § 62757. It provided further that this "stand-alone quota program may be funded by an assessment on milk produced in the state." *Id.* Subsection (c) of Section 62757 provided that the stand-alone quota program (the QIP) "shall be pursuant to a recommendation by the review board established pursuant to Section 62719 [*i.e.*, the PRB] and approved by a statewide referendum of producers conducted pursuant to Sections 62716 and 62717." *Id.*

70.    Section 62757 on its face delegated the formulation of the QIP entirely to the PRB. The Secretary had no authority to formulate the terms of the QIP or to submit a proposed stand-alone program to a producer referendum other than that which was recommended by the PRB. The Secretary was merely to "establish" the program recommended by the PRB and approved by a producer referendum. Cal. Food & Agric. Code § 62757.

71.    The Legislature did not include any legislative statement of purpose or intelligible principle in Section 62757 to guide the development and implementation of the QIP. The statute provided no standard by which the Secretary was to determine whether the stand-alone quota program recommended by the PRB and submitted to a producer referendum would comply with California state law or policy, or whether it was achieving any public purpose.

16

Complaint

72.     Sections 62716 and 62717 govern the producer referendum process that the California Legislature specified for the approval of the stand-alone quota program to be recommended by the PRB. Section 62716 specified the processes applicable to the producer referendum. *See* Cal. Food & Agric. Code § 62716. Section 62717 provided that the Secretary had no power to avoid, modify, disturb, amend, revise, veto, or decline to adopt the outcome of the producer referendum held pursuant to Section 62716. *See* Cal. Food & Agric. Code § 62717 ("If the director finds that producers on a statewide basis have assented in writing to the proposed pooling plan submitted to them for assent, the director *shall* place the proposed pooling plan into effect." (emphasis added)).

73.     Delegation by the California Legislature to the PRB to set the terms of the QIP was an aberrant departure from the process specified and followed for the promulgation of the original quota program that had operated under the Gonsalves Milk Pooling Act since 1969. That quota program was developed pursuant to Sections 62704 and 62705 of the Gonsalves Milk Pooling Act. Section 62704 provided that the CDFA—not the PRB—was to set the terms of the quota program. *See* Cal. Food & Agric. Code § 62704 ("The director is authorized to develop a proposed pooling plan and to designate the proposed areas in which the plan will be made effective."); *see also id.* at § 62705 (providing that a public hearing shall be held "[a]fter the director, with the advice and assistance of the formulation committee, has formulated the proposed plan"). And unlike the QIP, which had no legislative statement of purpose or intelligible principle, Section 62704 required that the quota plan under the Gonsalves Milk Pooling Act was to be scrutinized by the CDFA for conformity "with the purposes of this chapter[,]" that is, with the legislative purpose articulated in Sections 62700–62702 of the Gonsalves Milk Pooling Act.

74.     The Secretary was assisted in the formulation of the original quota program under the Gonsalves Milk Pooling Act by a formulation committee convened under Section 62704 and not by the PRB. *See* Cal. Food & Agric. Code § 62704. Although the formulation committee convened under Section 62704—like the PRB—was composed of California dairy farmers, Section 62704 specified that the membership of the formulation committee was—unlike the PRB—to be "reasonably representative of all producers" and thus of the interests of quota holders and of non-quota holders. *Id.* Unlike the PRB, where

Complaint

the Secretary's appointment power is limited to the slate of nominees provided by California dairy farmers, the Secretary's ability to select the formulation committee from among qualified members was plenary. *Id.*

75.    Unlike the QIP, which was promulgated without a public hearing, Section 62705 of the Gonsalves Milk Pooling Act specified that the pooling plan promulgated pursuant to the Act, including its quota program, was to be considered at a public hearing. Mr. Houston has explained that he selected the PRB to draft the QIP in part to avoid a public hearing held under Section 62705 on the merits of the proposed quota program and with the further purposes of (i) delegating the power to set the terms of the proposed quota program to the PRB rather than to the Secretary and (ii) avoiding any requirement that the QIP be scrutinized by the Secretary for its conformity with the laws and policy of the State of California. According to Mr. Houston:

> Moreover, in my opinion, the PRB process mandated by Section 62757(c) provided producers and industry with significantly more opportunities for input, more deliberation, and more process than would have occurred through a Section 62705 public hearing (which was a significant reason why the PRB process was chosen instead of the Section 62705 public hearing process). Whereas a Section 62705 public hearing is presided over by a single hearing officer, allows individual producers only one opportunity to testify, often spends substantial time poring over economic data regarding the milk market that the hearing officer needs to sift and weigh, and culminates with the hearing officer making a recommendation to the Secretary (***at which point the Secretary has significant discretion in determining what pooling plan amendments to allow producers to vote on in a referendum***), the PRB process under Section 62757(c) was led by a representative cross section of more than a dozen producers, allowed individual producers significantly more opportunity to provide their views and input (i.e., at each of the four PRB meetings and through communications with individual PRB members between hearings, if they so wished), was not concerned with sifting and weighing economic data (i.e., quota is almost a pure policy issue) and culminates in all members of the PRB getting an up or down vote on whether to recommend the QIP to [the] Secretary (***at which point it was envisioned that the Secretary would put the QIP as recommended by the PRB, without modification, to a statewide producer referendum***). (emphases added).

76.    According to Mr. Houston:

The Secretary, myself, others at CDFA, and the producer community were all familiar with what a Section 62705 public hearing is and what it entails, we specifically did not want

18

a Section 62705 public hearing to be part of the process of adopting the QIP under Section 62757.

77.    As the CDFA general counsel candidly admitted at a PRB meeting after the promulgation of the QIP, and in reference to the QIP: "These aren't regs [regulations]. I think that there are weaknesses here. The whole QIP program was adopted without going through the regulatory process. So I mean, for a lawyer, that's a concern, but that's how the QIP is operating now."

78.    As was true of the original quota program promulgated under the Gonsalves Milk Pooling Act, the CDFA has no authority to make any substantive amendment to the QIP absent approval of a producer referendum. *See* Cal. Food & Agric. Code § 62717. Thus, even if the Secretary were to find that the QIP no longer conformed to or effectuated the purposes of the statute, the statute prohibits her from terminating the program without the approval of the producers. *Id.*

79.    After the passage of Section 62757, the PRB formulated the QIP. The drafting of the QIP proceeded in stages. The PRB first instructed the CDFA about the terms and basic structure of the QIP that the PRB desired. The CDFA then drafted language to implement the PRB's instructions. The PRB then reviewed and edited the language proposed by the CDFA, including (as explained below) by eliminating a number of terms recommended by the CDFA that would have made the QIP easier to terminate, thus reducing the economic value of quota to quota holders. The PRB then submitted the edited language to the CDFA for its rubber-stamp approval. The draft minutes of a PRB meeting held on June 15, 2017, described the process this way:

> Undersecretary Houston stated the Board would create/provide CDFA the framework and CDFA will draft language based on the Board's recommendations. Draft language would be presented to the Board for adoption and recommendation to Secretary Ross.

As one trade association of dairy producers described the drafting of the QIP in a 2017 public comment sent to the CDFA:

> Ag Council is pleased with CDFA's involvement of dairy producers by reconvening the PRB and facilitating discussions around quota. The PRB has allowed the dairy industry to provide input and CDFA's guidance has been extremely helpful in this process. Ag Council thanks CDFA for creating a process that has been led by dairy producers in an effort to address the quota issue.

19

Complaint

80.     The terms of the QIP were drafted by the PRB to make termination of the QIP difficult in ways that departed from those established by the CDFA in other programs administered by the CDFA that (like the QIP) are funded by assessments on producers.

81.     A primary concern of quota-holding PRB members during the drafting of the QIP was the elimination from the QIP of possibilities to end the QIP through the referendum process or otherwise. Quota-holding PRB members frequently voiced concerns with suggestions by the CDFA that would have afforded easier and earlier options for termination of the QIP through referendum. Quota-holding PRB members frequently objected to CDFA proposals that would have made the program easier to terminate and more likely to be terminated because that would depress the economic value of quota to quota holders and, conversely, would have lightened the magnitude of the tax that quota holders impose through the QIP on non-quota holders. Quota-holding PRB members successfully worked together to eliminate such possibilities proposed by the CDFA in the draft QIP.

82.     One aspect of this collective action by quota-holding PRB members was the elimination of a process sought by the CDFA that is customarily included by the CDFA in other, similar programs that would have made termination of the QIP easier and more likely. Specifically, in the PRB's drafting of the QIP, the CDFA sought the ability to hold so-called "continuation hearings" every 5 years to determine industry support of the QIP. As the CDFA explained to the PRB in a May 2017 meeting held at the outset of the PRB's process in drafting the QIP:

> Assessment funded programs at CDFA are required to be reviewed every 5 years to determine if industry supports the continuation of the program.

> CDFA holds a continuation hearing where witnesses provide testimony regarding whether the program should be continued.

> If the hearing record contains overwhelming support for the continuation of the Stand-Alone Quota Program, the Secretary will announce its continuation.

> If the hearing record contains a mixture of both support and opposition, CDFA will hold a producer referendum to determine if the Stand-Alone Program will continue.

Complaint

83.     The continuation hearings held by the CDFA in connection with other producer-funded programs are elaborate affairs, with written agendas promulgated by the CDFA including suggested topics and the opportunity for industry participants and other interested parties to present testimony and evidence regarding those and other topics.

84.     According to the testimony of one PRB member at a CDFA hearing held September 9, 2024, the Secretary in 2017 told the PRB in the drafting of the QIP that the Legislature did not contemplate a QIP of indefinite duration: "We were told by Secretary Ross at the beginning of the PRB meetings back in 2017 that the legislature does not want marketing programs to go on and on forever."

85.     There was considerable disagreement between the CDFA and the PRB on the issue of the inclusion of a continuation review process. The CDFA explained to the PRB in the drafting of the QIP that "the Secretary is trying to be responsible and would like the proposed stand-alone quota program to include a five year continuation review process." According to another CDFA document, reflecting the comments of CDFA staff on the negotiations of this issue with the PRB:

> The PRB received significant input from the CDFA and deliberated at length on this issue. As explained by CDFA, unlike the current program, the QIP will be funded by direct assessments from producers and as a result, should include a review process. The review process is consistent with other CDFA programs.

86.     The PRB resisted the CDFA. According to the draft minutes of a PRB meeting held on August 2, 2017: "The Board questioned the five year review and still questioned the need. Concerns were reiterated regarding how the continuation process will devalue quota." The draft minutes of the June 15, 2017, PRB meeting provided:

> [CDFA] [s]taff addressed a review and re-approval component to the stand-alone program that would be consistent with other programs assessed under the Food and Agriculture Code. Most marketing order programs are subject to a review and re-approval process once every five years. This helps determine whether or not a program is needed by the industry assessed. Staff shared that a hearing could occur where witnesses would provide testimony related to the program's continuation. Depending on testimony, CDFA could submit the re-approval to a continuation referendum.

> [PRB] [m]embers indicated concern that a re-approval process devalues quota and puts into question the viability of the asset. Since the nature of the quota based program is



Complaint

different than that of a promotion or research program (such as the California Milk Advisory Board) it did not make sense to have a re-approval process.

87.    The PRB resisted the CDFA's efforts to include a requirement for continuation hearings in the QIP with the specific intent of increasing the economic value of quota to quota holders and, thereby, increasing the economic harm from the quota program on non-quota holders. As one participant in the process of drafting the QIP explained:

> In my opinion as a broker, such a five year "re-approval" component could possibly diminish the value of quota, because it would create a permanent cloud over quota that could cause a dairyman interested in purchasing quota to question whether or not the quota program would remain in effect after he or she, purchases quota. Dairymen purchasing quota want to be sure that they can recoup their investment. I believe a five-year "re-approval" component will add an element of risk to purchasing quota that in turn could have a negative effect on quota prices, and therefore to the value of quota owned by all dairymen. I think the negative effect could be even greater as the date for the five-year "re-approval" gets closer.

88.    The PRB was ultimately successful in eliminating from the QIP any mechanism for a continuation hearing or a continuation review process. In 2023, years after the QIP was implemented, producers petitioned for a continuation hearing, citing the CDFA's June 2017 statements to the PRB that such a hearing was customary and required in other similar programs administered by the CDFA. The Secretary denied the petition, writing:

> Currently QIP does not include language that would allow CDFA to conduct a continuation process periodically or otherwise; it only contemplates amendment and termination of the program.

89.    Another aspect of collective action by quota-holding PRB members to make termination of the QIP more difficult and less likely related to draft language that would have triggered a mandatory producer referendum in the event that the quota premium assessed through the QIP exceeded a certain threshold. Draft language suggested by the CDFA in July 2017 provided that "the continuance of the Plan shall be subject to approval by Producer Referendum any time the computed rate reaches a new threshold level of $0.0050 per pound of solids not fat above the initial rate [of $0.0450 per pound of solids not fat]." This draft language was eliminated by quota-holders on the PRB.

Complaint

90.     As one participant in the process of drafting the QIP explained:

The Cooperatives concur with the revisions to Article 9, Section 901 made during the August 2, 2017 Producer Review Board meeting. Like many others at the August 2, 2017 meeting, the Cooperatives take issue with the Initial Quota Plan's mandatory referendum that would be triggered by any fluctuation of $0.0500[1] for the quota assessment in Article 9, Section 901. As was spoken to by a number of producers, trade association spokespeople, and Producer Review Board members, a mandatory referendum trigger will lead to instability in the California quota program, signals a lack of faith in the program, and poses a likely insurmountable obstacle to implementation of new quota regulations in connection with a California FMMO.

91.     As another participant in the process of drafting the QIP explained:

WUD also supports the revised version of the draft language which removes the following statement: 'the continuance of the Plan shall be subject to approval by Producer Referendum any time the computed rate reaches a new threshold level of $0.005 per pound.' Such a statement adds another possibility for a referendum, which adds unnecessary uncertainty on the longevity of the program.

92.     Another aspect of collective action by quota-holding PRB members to make termination of the QIP more difficult and less likely related to changes to the survey of producers subject to the QIP required by Section 1100 of the QIP. The CDFA had originally sought language that would have specified that this survey was intended to and would gather information relating to whether the QIP should continue in force. Specifically, the CDFA had, in July 2017, proposed language in draft Section 1100 that provided that:

The continuation of this Plan is subject to a producer survey every five (5) years. The survey shall be conducted by an independent party selected by the Producer Review Board. The survey shall evaluate the effectiveness of the Plan and the desire of producers to continue operation of the Plan.

93.     Quota-holding PRB members opposed and removed reference to a survey of the "desire of producers to continue operation of the Plan" from the final QIP. As one participant in the QIP drafting process explained:

---

[1] In this excerpt, the Cooperatives appear to have misstated the fluctuation that would trigger a referendum. Under the original language of Article 9, § 901 of the QIP, the threshold was an increase of $0.0050 per pound of solids not fat.

23

Complaint

1
2
3
4
5
6
7
8
9

As was discussed at the August 2, 2017 Producer Review Board meeting, the Revised Quota Plan's reference, at Article 11, Section 1100, to a mandatory survey of producers on the California quota program every five (5) years raises a number of complications. First, there is no language identifying the nature of the issues to be covered by the survey. This broad reach will lead to confusion about what topics can be subject to survey. Furthermore, as currently phrased in the Revised Quota Plan, the provision suggests the survey could serve as a mandatory, mini-referendum on the California quota program every five (5) years. As was noted in paragraphs 8 and 9 above, and by numerous commenters before the Producer Review Board, that kind of constant peril will destabilize the California quota program and diminish producers' long term faith in its reliability, and thus its overall value. As such, the Cooperatives suggest that the determination of whether to conduct such a producer survey at any point in time be a subject for consideration by the Producer Review Board in the first instance, which may then make recommendations to the Secretary as it deems appropriate.

10    94.    By making the QIP of indefinite duration and frustrating the CDFA's efforts to secure
11  periodic reevaluations of the QIP, the quota-holding producers that dominated the PRB increased both
12  the length of time the QIP would be in place and the value of quota—and thus the economic benefit to
13  quota holders and economic harm to non-quota holders—in any given year.

14    95.    In September 2017, the PRB voted on its final draft of the QIP to the Secretary. That same
15  month, consistent with the intent of the CDFA in drafting Section 62757 and with the plain language of
16  Section 62757, the CDFA rubber-stamped the PRB draft.

17    96.    The record includes a one-page document dated September 17, 2017. It is titled
18  "Recommendation of the Producer Review Board and Determinations of the Secretary of Food and
19  Agriculture." By way of background, the document confirms that the Secretary "charged" the PRB with
20  developing the QIP; the PRB conducted public meetings; the PRB received input from the public and
21  technical assistance from CDFA staff; and that the PRB "developed the stand-alone criteria" of the QIP
22  and submitted it to the Secretary. The QIP was attached to this document. In a section titled
23  "Recommendation," the document reiterates that "the Board developed the QIP," and "Staff
24  recommends approving the QIP as submitted by the Board." The document concludes with the following
25  statement, above the Secretary's signature: "It is hereby determined that the newly developed QIP shall
26  become effective if it is assented by California dairy producers through a USDA referendum and a CA

27
28

Complaint

1   FMMO is enacted." A copy of the QIP, which is not found in the California Code of Regulations or in

2   any other official repository of California law, is attached as Exhibit A.

3        97.    Given that (i) the statute tasked the PRB with drafting the QIP, (ii) this document

4   acknowledges the Secretary charged the PRB with the drafting of the QIP, (iii) the statute does not allow

5   the Secretary to alter the PRB's draft, and (iv) the Secretary adopted the PRB's draft QIP wholesale, this

6   document's text asserting that "[t]he Secretary may adopt, deny, or alter the Board's recommendations

7   based upon her independent assessment of the Department's authority" was a sham, intended to obscure

8   the plain text of the statute that denied her any such authority and the reality that the PRB had been

9   wholly delegated this task.

10        98.    In contrast to this terse and conclusory finding, the CDFA's reviews of quota plans

11   recommended for promulgation by the PRB pursuant to the Gonsalves Milk Pooling Act were searching

12   and plenary, the findings of which were set forth in lengthy and reasoned written opinions.

13        99.    The Secretary then put the QIP to a referendum vote by producers. The QIP was approved

14   in December 2017 by a supermajority vote as required by section 62757(c). Pursuant to the express terms

15   of the QIP, the Secretary lacks any ability to revise or modify the material terms of the QIP unilaterally.

16   *See* QIP Sections 1101, 1102. Pursuant to the express terms of the QIP, the Secretary lacks any ability to

17   terminate the QIP unilaterally, even when the Secretary independently determines that the QIP is no

18   longer consistent with State law or policy. *See* QIP Section 1103.

19        100.    On June 7, 2018, California dairy farmers approved the adoption of the FMMO order in

20   the State of California. The California FMMO sets minimum prices that participating handlers must pay.

21   The FMMO price is a floor price, and handlers can and do pay prices higher than the FMMO floor price.

22        101.    Per the Gonsalves Milk Pooling Act, the pooling plan promulgated in accordance with that

23   Act is automatically suspended if a federal marketing order is adopted that conflicts with or renders that

24   plan unnecessary. *See* Cal. Food & Agric. Code § 62726.

25        102.    On November 1, 2018, the QIP began operating independently of any California revenue

26   pooling plan. Under the QIP, the CDFA levies an assessment on all handlers, who pay the money to the

27   CDFA. Handlers then pay the FMMO pool price to producers, deducting any monies previously paid to

28

Complaint

the CDFA under the QIP. *See* 7 CFR 1051.73 (a)(2)(viii). Under the terms of the QIP, quota-holding producers are also entitled to a premium payment, calculated by multiplying the quota-holding producer's monthly pounds of quota solids-not-fat by a predetermined quota premium rate, less any deduction for a regional quota adjuster. *See* QIP Section 1001.

103.    Quota holders thus receive the FMMO pool price (which reflects a reduction for the cost of the quota) plus the value of quota, and non-quota holders receive the FMMO pool price (as reduced to fund the quota). In this way, non-quota holders subsidize quota holders by receiving lower prices for their milk in an amount equal to the value of the quota payments to quota holders.

104.    The QIP continues in effect over the active but ineffectual resistance of non-quota-holding dairy farmers subject to the QIP, due to a super majority vote requirement to terminate or modify the QIP. A number of referenda to terminate the QIP have failed to garner the supermajority necessary for termination despite the strong support of a vocal minority. A 2021 referendum to terminate the QIP narrowly failed, while petitions for referenda to terminate in 2019, 2020, 2021, and 2022 were rejected by the CDFA on procedural grounds.

105.    The quota system under the QIP since 2017 has, through state control of the market, redistributed over five hundred million dollars in quota payments from non-quota holders to quota holders, money that could have been more equitably and efficiently used to invest in the industry according to market forces, money that non-quota holders should have been able to invest in their own businesses and employees.

### *Defendants' Control over the QIP During the Limitations Period*

106.    Defendants collectively control the PRB and have, through that control, taken overt acts within the four years prior to the filing of this Complaint in furtherance of a conspiracy to maintain the quota assessments levied pursuant to the QIP. Defendants collectively account for a majority of PRB members, hold quota, and benefit financially from the QIP, and collectively exercise their control over the PRB to impose quota assessments through the QIP by imposing unreasonable restraints on the ability of California dairy farmers holding no or little quota to (i) modify or terminate the QIP via referendum

Complaint

and (ii) obtain relief from the QIP on a case-by-case basis pursuant to a mechanism under the QIP known as the hardship petition.

107.    Absent a successful referendum to modify or terminate the QIP, the only mechanism that dairy farmers holding no or little quota have to seek relief from the operation of the QIP is a petition for a hardship consideration under Article 5 of the QIP for a reduction in quota assessments. As approved by the producer referendum of 2017, the QIP defines a "hardship" as "a challenge to the management and operation of a dairy farm due to the operation of this Plan." Thus, on its face, the hardship petition mechanism contemplates a process whereby a dairy farmer holding no or little quota may seek relief from the tax imposed by the QIP based on the adverse economic effects of the quota assessment. Pursuant to the QIP, hardship petitions are submitted in the first instance to the PRB, which, under Article 5, shall then make a recommendation to the Secretary of the CDFA. The QIP does not require the PRB to make a recommendation to the Secretary on hardship petitions on any schedule or deadline, thus providing the PRB with unfettered discretion to delay making a recommendation by "tabling" hardship petitions.

108.    The Defendants have conspired through the PRB to frustrate the ability of dairy farmers to obtain relief from the QIP through hardship petitions. Defendants have conspired, through their control of the PRB, to (i) impose unreasonable standards on hardship petitions; (ii) delay unreasonably the PRB's consideration of hardship petitions; and (iii) recommend denial of specific hardship petitions using unreasonable standards contrary to the plain language of the QIP.

109.    As opposition to the QIP and its quota assessments mounted in 2023 and 2024, Defendants imposed a moratorium on consideration of hardship petitions from May 2023 through at least May 2024. Defendants justified this moratorium by reference to a standard for hardship petitions that they—and CDFA's legal staff—acknowledged was contrary to, and more restrictive than, the actual text of the QIP. From May 2023 through May 2024, Defendants desired to implement this more restrictive standard in the PRB's determination of hardship petitions, but they were too embarrassed by the obvious conflict between the actual, expansive text of the QIP and the more restrictive standard that Defendants preferred to go through with implementing their preferred standard. As a result, Defendants simply declined to make recommendations on pending hardship petitions. In May 2024, the Defendants opted

to put their preferred, more restrictive standard into effect and simultaneously to seek to have their preferred standard embodied in the text of the QIP via producer referendum. When that referendum failed, Defendants continued to implement that more restrictive standard, despite the fact that the standard was not reflective of the text of the QIP and had now been affirmatively rejected in a producer referendum.

110.    Defendants' conduct as alleged herein has contributed meaningfully to the anticompetitive effects of the QIP. The PRB's decision to delay consideration of hardship petitions is unreviewable by the CDFA. When the PRB does make a recommendation, whether on hardship petitions or otherwise, the CDFA tends to defer, as a matter of principle, to the recommendations of the PRB. The Secretary of the CDFA wrote in December 2023 that "[a]s a matter of principle, my inclination is to support recommendations made by the PRB[.]" In those instances where the PRB has affirmatively recommended a denial of a hardship petition, the Secretary of the CDFA has, in most cases, adopted the PRB's recommendation without issuing a written decision explaining the reasons and rationale for that decision. Absent a written decision, there is no indication that the CDFA has undertaken a meaningful review of the merits of the PRB's recommendation to ensure its conformity with state law or policy or of any assumption by the State of California of political responsibility for the denial of the hardship petition. As one PRB member testified under oath in a September 2024 hearing, "[o]ver a dozen hardship cases" had been "turned down without any discussion of the individual merits of each case."

111.    By frustrating the ability of dairy farmers to obtain relief from the QIP through the referendum and hardship processes, Defendants have eliminated two important mechanisms through which California dairy farmers may seek relief from quota assessments, thereby extending the period of time in which quota assessments are levied and the magnitude of those quota assessments.

112.    Frank Konyn, a PRB member who worked in opposition to Defendants' conspiracy, testified under oath in September 2024 that the Defendants, through the PRB, acted to eliminate the possibility of "a snowball effect where more and more hardship cases would come in and that would be a back door undermining of the QIP program." Specifically, Mr. Konyn described a scenario whereby a small number of hardship petitions, once granted, would lead rapidly to the demise of the QIP and of the

Complaint

quota assessments levied under the QIP as the grant of the initial petitions would lead inexorably to the receipt of progressively more and more meritorious petitions as the quota assessments were levied against a progressively smaller base of dairy farmers. The Defendants' conspiracy, as alleged herein, thus eliminated a serious perceived threat to the continued operation of the QIP and had a direct causal impact on maintaining the quota assessments levied under the QIP.

113.    In August 2022, the PRB received a hardship petition from a California dairy farmer. Unlike other hardship petitions that had been filed in the past, this petition sought relief from the adverse economic effects of the quota assessments levied under the QIP and provided, in relevant part: "I recently sold 6113 cows and heifers by auction to try and pay off my loan at my bank. I laid off 50 employees and I owe about 1.5 million dollars to stay afloat, and if I didn't have to pay those quota taxes, I would have had $ 3,480,000 in my bank account to pay off the remaining debt." The petition requested reimbursement of past QIP assessments and exemption from "the Tax" going forward.

114.    The August 2022 hardship petition was considered at a PRB meeting in October 2022. At the October 2022 PRB meeting to evaluate the petition, the CDFA general counsel was asked what standard should be used in evaluating the petition, and the response was given that the standard was the broad one articulated in the QIP defining a "hardship" as "a challenge to the management and operation of a dairy farm due to the operation of this Plan." The August 2022 hardship petition met the requirements of a valid hardship petition under the QIP because it established "a challenge to the management and operation of a dairy due to the operation of this Plan [*i.e.*, the QIP]," as specified in the definition of a "hardship" under the QIP approved by the producer referendum of 2017. However, the Defendants voiced concerns that granting the petition under this broad standard actually articulated in the QIP for hardship petitions would lead to other hardship petitions seeking similar relief based on the adverse economic effects of the quota assessment, or the "snowball effect" described by Mr. Konyn and as alleged above. After a discussion, the PRB voted to recommend denial of the hardship petition in Board Action 2022-1. Defendants Charles Ahlem, William Dyt, Anthony Nunes III, Kerri Vander Poel, Art Van Beek, Arlin Van Groningen, and Case Van Steyn voted to recommend the denial.

Complaint

115.    In February 2023, the PRB received at least two hardship petitions from California dairy farmers. The February 2023 petitions were considered at a May 2023 PRB meeting.

116.    The May 2023 PRB meeting introduced two innovations into the PRB's handling of hardship petitions. First, the Defendants adopted a strategy of "tabling" hardship petitions, meaning not making a recommendation to the CDFA. This strategy allowed the Defendants to exercise unreviewable power to effectively deny the hardship petitions. Second, the Defendants agreed at this meeting to attempt to implement a new, more restrictive standard for the review of hardship petitions. Rather than the broad standard contained in the QIP for evaluating hardship petitions, which on its face allowed for such petitions to be granted based solely on the adverse economic effects of the quota assessment, Defendants decided at this May 2023 meeting to instead attempt to limit hardship petitions to those that related to technical determinations relating to eligibility for, exemptions from, and transfers of quota. The Defendants were originally hesitant, however, to implement this new standard, as they were advised by counsel that their new standard was contrary to the actual text of the QIP as approved by the producer referendum of 2017.

117.    At the May 2023 PRB meeting, two motions made by non-quota holder members of the PRB to recommend that the CDFA grant the petitions received in February 2023 were rejected by the PRB. Defendants William Dyt, Fred Fagundes, Joseph Fernandes, Anthony Nunes III, Kerri Vander Poel, Art Van Beek, and Case Van Steyn voted against the motions to recommend the petitions be granted in Board Action 2023-3 and Board Action 2023-4. The PRB's decision to effectively table these two hardship petitions was unreviewable by the CDFA and tantamount to a rejection of these petitions.

118.    The strategy of "tabling" hardship requests introduced at the May 2023 PRB meeting is directly contrary to the plain language of the QIP. Article 5 of the QIP provides that "[t]he Producer Review Board shall submit its recommendation [on a hardship petition] in writing to the Secretary, along with its findings." Only by making such a recommendation does the PRB allow the Secretary to act on a hardship petition and to review the actions of the PRB for consistency with state policy. The Defendants adopted the strategy of "tabling" hardship petitions in order to evade active supervision by the State of California of their conspiracy to maintain quota assessments levied pursuant to the QIP. Instead,

Complaint

Defendants wished to constructively deny the hardship petitions using the more restrictive standard discussed at the May 2023 PRB meeting, a standard contrary to the plain language of the QIP, without putting it to the test of the active supervision of the State of California. As alleged below, in 2025 the CDFA blessed this strategy by purporting to confirm—contrary to the plain language of the QIP—that the PRB may delay consideration of hardship petitions indefinitely.

119.    In September 2023, the PRB received another hardship petition requesting relief from the adverse economic impacts of the quota assessment. This hardship petition was considered at an October 2023 PRB meeting. Non-quota holders moved to recommend that the Secretary grant the petition. As it had done at the May 2023 meeting, the PRB "tabled" this petition in Board Action 2023-10 by not making a recommendation to the CDFA. The PRB's decision to effectively table this hardship petition was unreviewable by the CDFA and tantamount to a rejection of this petition. Defendants Arie H De Jong, William Dyt, Fred Fagundes, Joseph Fernandes, Anthony Nunes III, Kerri Vander Poel, Art Van Beek, and Case Van Steyn voted against the motion to recommend the petition be granted. Once again, the Defendants justified the "tabling" of this petition on the basis of the new, more restrictive standard introduced at the May 2023 PRB meeting, a standard contrary to the plain language of the QIP.

120.    At the October 2023 PRB meeting, the results of a survey of California dairy farmers subject to the QIP, conducted by the CDFA and showing widespread discontent about the adverse economic impacts of the QIP and a similarly widespread desire to terminate the QIP, were presented to and discussed by the PRB. At this October 2023 PRB meeting, two non-quota holders on the PRB made a motion to recommend to the Secretary that the QIP continue in operation only if reaffirmed by the same mechanism in which it had been implemented in 2017, namely, with a supermajority in *support* of the QIP rather than (as under the process for termination) with a supermajority in *opposition* to the QIP. This motion to recommend a reapproval referendum failed in Board Action 2023-11. Defendants Arie H De Jong, William Dyt, Anthony Nunes III, Kerri Vander Poel, Art Van Beek, and Case Van Steyn voted against the motion.

121.    The PRB met again in November 2023. As at the meeting the prior month, at this November 2023 PRB meeting, two non-quota holders on the PRB made a motion to recommend to the

Complaint

Secretary that the QIP continue in operation only if reaffirmed by the same mechanism in which it had been implemented in 2017, namely with a supermajority in *support* of the QIP rather than (as under the process for termination) with a supermajority in *opposition* to the QIP. This motion to recommend a reapproval referendum motion failed in Board Action 2023-14. Defendants Jarrid Bordessa, Arie H De Jong, William Dyt, Fred Fagundes, Joseph Fernandes, Anthony Nunes III, Art Van Beek, Arlin Van Groningen, and Case Van Steyn voted against the motion.

122.   In November 2023, the PRB received at least eight hardship petitions from California dairy farmers holding no or little quota seeking relief from the adverse economic effects of the quota assessments levied pursuant to the QIP. These hardship requests provided, in relevant parts, that:

- "I am requesting a hardship consideration. My Dairy is currently losing money. I'm having to borrow money each month to pay my dairy bills. I'm requesting the money taken from my check for the QIP each month to be suspended indefinitely or until I can pay off my Dairy debts."

- "My wife and I started our dairy business in 1998. We ship our milk to Hilmar Cheese Company. We've had a considerable amount of challenges throughout the years as we are having now. With high feed process and low milk income, it is extremely hard to pay our bills, as I am continuously borrowing money to be able to pay them. As of 1998-2023, N&C Silveira has paid an estimate of $2,000,000+ into the Quota program, through the deductions in our creamery checks. I am requesting a hardship consideration. Furthermore, I am requesting that the QIP payments from our milk check be suspended indefinitely. It is an outdated program that is dividing our industry and putting neighbors against each other."

- "I cannot afford to keep funding the illegitimate QIP program which not only is outdated but serves very few and takes from the majority. At current income and input costs, my dairy is unable to continue to fund QIP. Our industry is on the decline; please don't let us be another dairy to go out of business. Suspend the QIP deduction from my income."

- "Dairy Avenue, LLC is currently losing money, we have been struggling with historical high feed costs for years now. We are borrowing money at unprecedented levels each month just to keep up with the ever-increasing costs due to inflation and regulations. I'm requesting the money taken from my check for the QIP each month be suspended indefinitely or until the industry can pay a fair milk price. Without this consideration it is going to be difficult to continue in the Dairy business."

- "I am a California Dairyman and due to low milk price & high feed cost I am requesting a hardship consideration. My dairy is currently losing money. I'm having to



Complaint

borrow money each month to pay my Dairy bills. I'm requesting the money taken from my check for the QIP each month be suspended indefinitely or until I can pay off my debts. Without this consideration it is going to be difficult to continue in the Dairy business."

- "Our family dairy farm has been negative losing money for most of this year, negative hundreds of thousands dollars a month, I find it hard to sleep a night knowing this, we are at the breaking point to keep our third generation dairy farm in business, I feel I a [*sic*] alone as most of our family friends who had a family dairy farms [*sic*] have gone out of business, I'm having to borrow money each month to pay my bills. I'm requesting the money taken from my milk paycheck for the QIP each month be suspended indefinitely, as we all understand it is only benefitting the **minority** not the ***majority*** of Californian Dairy farmers, QIP is wrong and unfair. Please consider this request to keep family dairy farms in existence in our wonderful state of California." (emphases in original)

123.    In February 2024, the PRB received a hardship petition stating, in relevant part:

The quota system was implemented long before my time, forcing us to deduct $9,029.00 from our monthly milk proceeds continually. Even attempts to compensate for this loss by increasing milk production result in further deductions, leaving us in perpetual financial instability. Despite our tireless efforts, our earnings consistently fall below the cost of operating our business. It costs our business $21.00 to operate, and our pay price has been $17.00 per hundredweight gross. Each month, our equity decreases, and our hopes for financial stability are lost as we cannot afford to purchase quota to close the gap. This has left us at a financial disadvantage to those with greater financial means.

Moreover, this is a form of "taxation without representation," providing no tangible benefit in return. While struggling to meet our tax obligations at the state, federal, and county levels, we endure the burden of the quota tax assessment, which totals $108,348.00 per year or a staggering $1,083,480.00 over a decade. These losses represent more than just numbers on a balance sheet; they translate into tangible sacrifices, such as a load of hay or grain that could have been paid for each month or financial stability for my children.

124.    The harms caused by the QIP and its quota assessments described in these hardship petitions are exemplary of the harms suffered by all Plaintiffs and of all California Grade A dairy farmers holding low or no quota. These hardship petitions met the requirements of a valid hardship petition under the QIP because they established "a challenge to the management and operation of a dairy due to the operation of this Plan [*i.e.*, the QIP]," as specified in the definition of a "hardship" under the QIP approved by the producer referendum of 2017.

125.    At a PRB meeting in February 2024, the PRB agreed to table these and other pending hardship petitions rather than to make a recommendation to the CDFA. The PRB's decision to table



Complaint

these hardship petitions was unreviewable by the CDFA. In Board Action 2024-7, Defendants Charles Ahlem, Joseph Fernandes, and Kerri Vander Poel voted to table the pending hardship petitions. Defendants William Dyt, Fred Fagundes, Art Van Beek, and Arlin Van Groningen voted against the motion to table the pending hardship petitions, on information and belief, because they preferred instead to deny the petitions outright under the new, more restrictive standard first proposed at the May 2023 PRB meeting, a standard that was contrary to the plain text of the QIP.

126.    The PRB also agreed at the February 2024 meeting to seek guidance from the Secretary of the CDFA on the substantive standard to be used in evaluating hardship petitions. That guidance from the Secretary never came. Instead, in April of 2024, CDFA staff advised the PRB that, in their opinion, the PRB should deny hardship petitions based solely on the adverse economic effects of the QIP on petitioning dairies because the grant of such hardships would undermine the "QIP's financial health" and "threaten[] program stability."

127.    The PRB met again in May 2024. At the May 2024 meeting, the PRB agreed to recommend amendments to the text of the QIP for the CDFA's submission to a producer referendum. One such amendment related to the standard relating to hardship petitions. The PRB agreed to recommend an amendment to the QIP to effectuate the more restrictive standard for hardship petitions first discussed a year earlier at their May 2023 meeting. Mr. Konyn testified in September 2024 that the effect of this amendment was to ensure "that future hardship requests would be limited to granting relief strictly from provisions regarding eligibility, exemptions, and transfers [of quota]." The text of the proposed amendment added language reading: "Hardship requests will be limited to provisions regarding: (a) eligibility for pool quota; (b) pool quota allocations and assignments; (c) provisions regulating transfer of pool quota; (d) loss of pool quota; and (e) other matters relating to assignment or use of quota." The proposed amendment would have eliminated the ability of dairy farmers to seek relief from the adverse economic effects of the quota assessments levied pursuant to the QIP through the hardship petition process.

128.    The second amendment to the text of the QIP recommended by the PRB at its May 2024 meeting was to address a yawning disparity between actual Class 1 sales and the calculation of quota

assessments levied under the QIP by reducing the quota assessments to make them more reflective of actual Class 1 sales.

129.    The original intent of milk quota was to return the profits of Class 1 sales of Grade A Milk to quota holders. Actual Class 1 sales have fallen substantially since the adoption of the QIP. However, the assessment levied by the CDFA pursuant to the QIP—which is based on historical Class 1 sales—has not been adjusted downward to account for the declining prevalence of Class 1 sales. As a result, approximately $280 million has been improperly given to the quota holders based on this false Class 1 sales assumption since 2018.

130.    One memorandum presented to the PRB in February 2024 explained the issue in this way:

> Since the program was launched till today class 1 sales have fallen to the point we now have 22 percent of the state's milk production getting a 1.73 a hundred weight of milk payment for their state issued quota certificates and only 10 percent of the state's milk is sold as class 1 or bottled milk. The payments the dairymen pay for the state issued quota is more than double what it should be and more importantly if the quota program had any merit why is it that a program that was launched to support class 1 sales has sat back and watched class 1 sales fall year after year and yet they do nothing but keep ensuring the quota payments are made.

131.    Another PRB memorandum from February 2024, apparently authored by Mr. Konyn, explained the issue in this way:

> Class 1 sales have continued to fall steadily while the QIP differential remains fixed at the level it was established in 1994. Currently for the calendar year 2023, the Class 1 differential revenue for the California FMMO was $88,943,905. The QIP program during that same time frame has paid out $142,225,321 in quota payments. This burden of $53,281,415 is being removed from all classes of milk to compensate quota holders at approximately a cost of $0.132 per cwt. Today, non-quota holders would be far better off if the rules for calculating quota payments were those that were in effect in 1993 instead of the fixed differential. This is an inequitable and unsustainable situation and contributes greatly to the unrest in the producer community.

132.    The third amendment to the text of the QIP recommended by the PRB at its May 2024 meeting was to address another redundancy in another aspect of the quota assessment levied under the QIP that also resulted in overpayments to quota holders by eliminating regional quota adjustments.

Complaint

133.     Non-quota holders on the PRB sought to separate the proposed amendments to the QIP to allow California dairy farmers the ability to vote to reject the more stringent proposed criteria for hardship petitions while voting to accept the reduction in quota assessments proposed through the other two proposed amendments. Defendants successfully opposed that request to separate the agenda items, with Mr. Konyn explaining that the three amendments were a compromise between the economic interests of California dairy farmers holding substantial quota and those of California dairy farmers holding no or little quota. The Secretary of the CDFA again rubber-stamped the recommendation of the PRB to put the three amendments to a producer referendum as a package. The referendum failed in February 2025.

134.     Heedless, the PRB did not even wait for the outcome of this referendum to begin to implement its more restrictive standard for deciding on hardship petitions. At the May 2024 PRB meeting where the amendment to the hardship petition standard was recommended to the CDFA for submission to a producer referendum, the PRB also voted, in Board Action 2024-12, to recommend denial of 10 pending hardship petitions seeking relief from the adverse economic effects of the quota assessments levied pursuant to the QIP using that same more restrictive standard, with Defendants Arie H De Jong, Joseph Fernandes, Art Van Beek, William Dyt, Anthony Nunes III and Arlin Van Groningen voting in support of the motion.

135.     The PRB met again in December 2024. At that meeting, the PRB voted to recommend denial of five hardship petitions, again improperly using the more restrictive standard for hardship petitions that was, at that time, subject to a then-ongoing producer referendum rather than the more lenient standard embodied in the QIP itself. Defendants Charles Ahlem, Jarrid Bordessa, Arie H De Jong, William Dyt, Fred Fagundes, Joseph Fernandes, Anthony Nunes III, Kerri Vander Poel, and Art Van Beek voted to recommend denial of four such petitions, in Board Action 2024-20, with the same Defendants voting to recommend denial of the fifth petition in Board Action 2024-19. At this meeting, PRB members again justified their recommendation to deny the hardship petitions on the grounds that granting the petitions would undermine the QIP and harm the economic interests of quota holders by leading to many other petitions, a reference to the "snowball effect" feared by the Defendants.

Complaint

136.     The PRB met again in May 2025. During that meeting, five hardship petitions seeking relief from the adverse economic impacts of the QIP were denied under the same limiting standard, which had by that time been affirmatively rejected in the February 2025 producer referendum. Defendants William Dyt, Anthony Nunes III, Fred Fagundes, Jarrid Bordessa, Alex De Jager, Dominic Assali, and Darlene Lopes voted to recommend denial of each of these petitions. At this meeting, PRB members again justified their recommendation to deny the hardship petitions on the grounds that granting the petitions would undermine the QIP and harm the economic interests of quota holders by leading to many other petitions, a reference to the "snowball effect" feared by the Defendants.

137.     The failure in February 2025 of the proposed amendment to the hardship standard sought by the quota holders on the PRB in the producer referendum left the Defendants in an awkward and exposed position. As Mr. Konyn had testified under oath in September 2024:

> If the referendum does not pass, it will be difficult for the PRB to continue kicking the can down the road on these hardship cases. Looking at the wording in the Plan, even quota holders could claim hardship, and if approved then they would be exempt from paying the quota assessment but would still receive their quota payment. The less assessments that are collected to support the program, the quicker the assessment rate will go up for those remaining producers that are paying the assessment.

Here, Mr. Konyn was referring to the "snowball effect" that he testified to in the same hearing, whereby a grant of a few initial hardship petitions would rapidly lead to an avalanche of progressively more, and progressively stronger and more urgent, hardship petitions as the remaining California dairy farmers subject to the quota assessments sought relief from the quota assessments.

138.     The failure of the PRB to secure its more restrictive standard for hardship petitions in the 2025 producer referendum raised again the possibility of the "snowball effect" described by Mr. Konyn and the risk that the PRB's ability "to continue kicking the can down the road on these hardship cases" would be jeopardized as described by Mr. Konyn in his September 2024 testimony. As alleged above, neither the CDFA nor the PRB has the authority to set the terms of the QIP or to unilaterally modify, amend, or terminate the QIP or any of its material terms. Absent a producer referendum approving

Complaint

1  changes to the QIP's hardship standard, neither the CDFA nor the PRB has the authority to change the

2  standard specified in the QIP for the evaluation of hardship petitions.

3       139.    To address the risk of a "snowball effect" from meritorious hardship petitions that would

4  lead inexorably to the end of the QIP in the wake of the rejection of their preferred, more restrictive

5  standard for hardship petitions in the 2025 producer referendum, the PRB caused the CDFA in May 2025

6  to issue a guidance document. In this document, the Secretary further abdicated any supervision of the

7  PRB and the quota program by clarifying that the PRB "may delay indefinitely making a

8  recommendation" on a hardship petition. This ensured that the PRB—and by extension Defendants—

9  would continue to have the unreviewable power to block indefinitely hardship requests no matter their

10  merit or their conformity with the plain language of the QIP's definition of a "hardship." This May 2025

11  guidance is unlawful as contrary to the plain language of the QIP as approved by the producer referendum

12  of 2017, which provides that the PRB "shall" make a recommendation on hardship petitions to the

13  Secretary. But even assuming that the Secretary is correct, and that the PRB may indeed, consistent with

14  the QIP, "delay indefinitely making a recommendation" on a hardship petition, this only confirms the

15  absence of any active supervision by the State of California of the unlawful conduct of the Defendants as

16  alleged herein.

17       140.    The PRB met again in September 2025. At this meeting, the PRB denied additional

18  hardship petitions seeking relief from the adverse economic impact of the quota assessments levied

19  pursuant to the QIP.

20  **First Cause of Action**

21  **Restraint of Trade – Sherman Act 15 U.S.C. § 1**

22       141.    Plaintiffs reallege Paragraphs 1–140 above.

23       142.    The conduct of Defendants as alleged herein is an unreasonable restraint of trade in

24  violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Defendants conspired, through their control of

25  the PRB, to impose unreasonable restraints on the ability of dairy farmers holding no or little quota to

26  seek relief from the adverse effects of the QIP, thereby contributing to the maintenance of the QIP and of

27  its anticompetitive effects.

28

Complaint

143.   The relevant antitrust market in which to assess the Defendants' conduct as alleged herein is the market for raw Grade A milk produced and sold in California. The Defendants have market power in the relevant market through their control over the PRB.

144.   The conduct of Defendants alleged herein is *per se* illegal, or, in the alternative, illegal under the Rule of Reason or the "quick look" analytical framework. Defendants' conduct was not reasonably related to, or reasonably necessary for, any procompetitive effects of the QIP. Alternatively, there are no procompetitive effects of the QIP that outweigh its substantial anticompetitive effects or that could not be achieved through less restrictive means.

145.   The conduct of the Defendants as alleged herein has harmed competition and purchasers in the relevant market by restraining competition among producers in the relevant market. Due to Defendants' unlawful conduct to maintain the quota assessments levied pursuant to the QIP, the costs of Plaintiffs and other dairies holding no or little quota have been elevated, reducing their ability to compete with Defendants and other dairies holding quota. As a result, Plaintiffs and other dairies holding no or little quota have been forced to cede market share to quota-holding dairies or, in some cases, to go out of business. This reduction in competition predictably and in fact injures purchasers in the relevant market in the form of higher prices.

146.   The conduct of Defendants has caused injury and damage to Plaintiffs, both in the form of lost profits and in the form of quota assessments paid pursuant to the QIP.

147.   The injury of the Plaintiffs is an antitrust injury, flowing from that which makes the Defendants' actions unlawful under the Sherman Act. The Defendants' conspiracy has simultaneously and through the same mechanism harmed both Plaintiffs and purchasers in the relevant market. In the absence of Defendants' conspiracy: (i) the Plaintiffs' costs would be lower, and their revenues and profits greater; and (ii) prices paid by purchasers in the relevant market would be lower. The QIP functions as a "tax" on non-quota-holding dairy farmers. The normal and predictable effects of the tax are to cause the taxed dairy farmers to increase their prices or to cede market share to quota-holding dairy farmers. This effect also puts an upward bias on the prices charged by quota-holding dairy farmers who obtain power over price as a result of raising the costs of their rivals. By maintaining the quota assessments levied

Complaint

pursuant to the QIP, the Defendants' conduct has meaningfully contributed to the imposition and maintenance of these anticompetitive effects of the QIP. But for the Defendants' conduct, prices in the relevant market would be lower, output would be higher, and consumers and non-quota-holding dairy farmers alike would benefit.

148.    The conduct of Defendants as alleged herein is not subject to any state action or petitioning immunity. Defendants have conspired, through their control of the PRB, to deny hardship petitions using standards contrary to the plain language of the QIP and to delay or eliminate entirely the ability of the State of California to actively supervise their conduct. The May 2025 guidance of the CDFA that the PRB "may delay indefinitely making a recommendation" on a hardship petition, and thereby any review of that hardship petition by the Secretary of the CDFA, confirms that there is no active supervision by the State of California of the Defendants' conduct as alleged herein. In those instances where the PRB has affirmatively recommended a denial of hardship petitions, the Secretary of the CDFA's review has often lacked the rigor required to demonstrate active supervision of the PRB's recommendation. Of the dozens of hardship petitions filed since 2022 seeking relief from the adverse economic effects of the quota assessments levied pursuant to the QIP, the Secretary has failed to follow the PRB's recommended denial of those petitions in only one instance, typically endorsing the PRB's recommendation without a written statement of her reasoning or rationale.

**Prayer For Relief**

Wherefore, Plaintiffs respectfully pray for relief and judgment against Defendants as follows:

1.    That the Court enter an order declaring that Defendants' actions, as set forth in this Complaint, violate the law;

2.    That the Court hold Defendants jointly and severally liable for the injuries caused by each one of them and their co-conspirators and award Plaintiffs actual damages in an amount to be determined at trial, such amount to be trebled as permitted by law;

3.    That the Court award Plaintiffs pre- and post-judgment interest on any recovery;

4.    That the Court award Plaintiffs their costs of suit, including reasonable attorneys' fees and expenses;



Complaint

5.      That the Court award Plaintiffs a permanent injunction under Section 16 of the Clayton Act, enjoining Defendants from continuing to conspire as alleged herein; and

6.      That the Court award such other relief as the Court may deem just and proper.

November 19, 2025                    /s/ Michael A. Columbo
                                     Michael A. Columbo (SBN: 271283)
                                     mcolumbo@dhillonlaw.com
                                     Jesse Franklin-Murdock (SBN: 339034)
                                     jfm@dhillonlaw.com
                                     DHILLON LAW GROUP INC.
                                     177 Post Street, Suite 700
                                     San Francisco, CA 94108
                                     (415) 433-1700

                                     Christopher G. Renner*
                                     D.C. Bar No. 1025699
                                     cgrenner@dhillonlaw.com
                                     Domenic P. Aulisi*
                                     Virginia Bar No. 101045
                                     daulisi@dhillonlaw.com
                                     DHILLON LAW GROUP INC.
                                     2121 Eisenhower Avenue, Suite 608
                                     Alexandria, VA 22314
                                     (415) 433-1700

                                     *    *pro hac vice* forthcoming

                                     **Attorneys for Plaintiffs**



Complaint

## **Demand for Jury Trial**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand trial by jury on all claims and issues so triable.

November 19, 2025

*/s/ Michael A. Columbo*
Michael A. Columbo (SBN: 271283)
mcolumbo@dhillonlaw.com
Jesse Franklin-Murdock (SBN: 339034)
jfm@dhillonlaw.com
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, CA 94108
(415) 433-1700

Christopher G. Renner*
D.C. Bar No. 1025699
cgrenner@dhillonlaw.com
Domenic P. Aulisi*
Virginia Bar No. 101045
daulisi@dhillonlaw.com
DHILLON LAW GROUP INC.
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314
(415) 433-1700

\*    *pro hac vice* forthcoming

***Attorneys for Plaintiffs***



Complaint